**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN WATERLOO DIVISION**

WAYNE SMITH,

             Petitioner,

vs.

RUSTY ROGERSON,

             Respondent.

No. C06-2011-MWB

**REPORT AND RECOMMENDATION
ON PETITION FOR WRIT OF
HABEAS CORPUS**

_____

This matter is before the court on a petition for writ of *habeas corpus* filed by the petitioner Wayne Smith pursuant to 28 U.S.C. § 2254. Doc. No. 3. The respondent Rusty Rogerson (the "State") answered the petition on May 10, 2006. Doc. No. 7. On May 31, 2006, the State submitted documents from the state court case leading to Smith's conviction, his postconviction relief action, his appeal from the denial of postconviction relief, proceedings following the appellate court's remand of the case for further proceedings, and final appeal. Doc. No. 9, supplemented by Doc. No. 17. Smith filed a brief in support of his petition on December 1, 2006. Doc. No. 16. The State filed a responsive brief on December 12, 2006. Doc. No. 18. Smith filed a reply brief on March 13, 2007. Doc. No. 20. On March 6, 2008, the Honorable Mark W. Bennett referred the matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), for review and the submission of a report and recommended disposition of the case. Doc. No. 27. The matter is now fully submitted and Smith's petition is ready for review by the court.

### *Factual and Procedural History*

The charges against Smith arose from events that occurred on December 8 and 9, 1999. Details of the acts Smith was accused of committing are, for the most part, not relevant to consideration of his petition for writ of *habeas corpus*. For purposes of this

proceeding, the court will provide only a brief summary of the facts.  On the morning of December 9, 1999, police were called to the home of the victim to investigate a domestic assault report.  The victim claimed Smith had spent the night of December 8-9, 1999, physically and sexually assaulting her, holding her against her will, and moving her from room to room within her house while the assault continued.  The victim had cuts on her head that required stitches, cuts and bruising on other parts of her body, and severe burns to the front of her torso.  She stated Smith had caused all of her injuries.

On December 22, 1999, Smith was charged in a four-count Amended Trial Information in Black Hawk County, Iowa, Case No. FECR089868, as follows.   In Count I, he was charged with Kidnapping in the First Degree, in violation of Iowa Code sections 710.1 and 710.2.  In Count II, he was charged with Sexual Abuse in the Second Degree, in violation of Iowa Code sections 709.1 and 709.3.  In Count III, he was charged with Willful Injury and Being an Habitual Offender, in violation of Iowa Code sections 708.4 and 902.8.  The Habitual Offender charge arose from Smith's previous felony convictions for Sexual Abuse in the Second Degree on May 23, 1980, and Forgery on August 26, 1988.  In Count IV, he was charged with Assault Domestic Abuse with the Intent to Cause Serious Injury, in violation of Iowa Code section 708.2A(2)(c).

On August 22, 2001, Smith entered an *Alford* plea[1] of guilty to reduced charges of Kidnapping in the Third Degree, Assault with Intent to Commit Sexual Abuse, and Willful Injury, all three as an Habitual Offender.  *See* Doc. No. 17 at 1(*l*), Transcript of Plea and Sentencing, *State v. Smith*, No. FECR089868 (Black Hawk County, Iowa Aug. 22, 2001) ("Plea Tr.").  He proceeded directly to sentencing, and he was sentenced to indeterminate terms of imprisonment not to exceed fifteen years, with a mandatory minimum of three

---

[1]In an *Alford* plea, the defendant is not required to admit he committed the crimes charged.  *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 167, 27 L. Ed. 2d 162 (1970) ("[A]n express admission of guilt . . . is not a constitutional requisite to the imposition of criminal penalty.  An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").

years, on each charge, with the three sentences to run consecutively. He also was fined $1,000 on each charge, with the fines suspended. Plea Tr. at 23-24.

Smith did not file a direct appeal. He filed an application for postconviction relief ("PCR") on February 22, 2002, asserting the following grounds for relief:

A.    The convictions and sentences were in violation of the United States Constitution and/or the Constitution or laws of this state.

B.    The court was without jurisdiction to impose sentences.

C.    The sentences exceed[] the maximum authorized by law.

D.    There exists evidence of material facts, not previously presented and heard, that requires vacation of the convictions and sentences in the interest of justice.

E.    The convictions and sentences are otherwise subject to collatteral [sic] attack upon grounds of alleged error formerly available [sic] under any common law, statut[e], or other writ, motion, proceeding, or remedy.

Doc. No. 9 at 3(b), Application for Postconviction Relief, at 3. Smith provided the following "[s]pecific explanation of grounds and allegations of facts":

A.    The convictions and sentences were in violation of the United States Constitution and the Constitution and laws of this state for the following reasons.

1.  Defendant maintained his innocense [sic] and refused to plead guilty.

2.  There was no factual basis for the court to find guilt.

3.  Sexual Abuse is a lesser included offense of Kidnapping and sentences for both is multiple sentencing and double jeopardy.

4.  There was no serious injury to the victim to uphold a finding of guilt for a class C wilful injury.

5.  There was no removal or confinement to uphold a finding of guilt for kidnapping.

> 6. There was no evidence of the type of sexual abuse that the victim claimed she suffered and her story was not creditable.
>
> 7. Sentencing of 3 separate habitual offender charges and running them consecutive was multiple sentencing and double jeopardy[.]
>
> 8. Defendant's Counsel was ineffective in many different ways.

*Id.*, pp. 3-4.

Smith requested the following relief: "1. Dismissal of the kidnapping with habitual offender and the Sexual abuse with the habitual offender. OR 2. A hearing to develope [sic] ineffective assistance of counsel. AND 3. A new trial on all charges." *Id.*, p. 5.

On April 3, 2002, the State filed a motion to dismiss Smith's PCR application on the basis that Smith had failed to preserve the above issues by failing to file a direct appeal, and his entry of a guilty plea waived all defenses and objections. Doc. No. 9 at 3(c), Motion to Dismiss (citations omitted). Smith filed a *pro se* resistance to the motion to dismiss on April 12, 2002. The court appointed an attorney to represent Smith on May 28, 2002, and on September 23, 2002, Smith, through his counsel, filed an Amended Application for Post-Conviction Relief "to add the following issues for consideration by the Court":

> A. That trial counsel advised [Smith] incorrectly that an appeal would not be appropriate and all issues that he wanted to raise could be in fact raised on Post-Conviction Relief.
>
> B. That the trial court failed to advise [Smith] at the time of entering his plea of guilty of his right to file a Motion in Arrest of Judgment and the fact that by proceeding to immediate sentencing, the right to file a Motion in Arrest of Judgment would be waived.[2]

---

[2]The copy of the Amended Application for Post-Conviction Relief provided to the court contains a handwritten entry immediately below paragraph 1.B., as follows:
  B. That trial court error [sic] in not explaining what a motion in arrest of

C.      That trial counsel misled or permitted [Smith] to be misinformed with regard to the elements of the case as filed against him, the existence of lesser-included offenses which were likely to be considered by the jury, and to otherwise adequately prepare for trial.

D.      That trial counsel failed to adequately advise [Smith] of options available in response to the charges as filed against him.

E.      That there was no factual basis for the court to accept a guilty plea and, in fact, the defendant informed the court, before it accepted [the] plea, several times that he was not guilty, was being done an injustice by the State, and that he was not satisfied with the services of his attorney.

F.      That [Smith] was coerced into accepting immediate sentencing and that he informed the court that it was not part of the plea agreement and he did not wish to do so.

G.      That the sentencing court, on page 6 lines 2-4 of the sentencing transcript, lead [Smith] to believe that if he went to trial he would have to prove he was innocent.

H.      That it was an error of the court and ineffective assistance of counsel to insist that [Smith] waive any appeal rights, agree to immediate sentencing, and thereby give up the right of a Motion in Arrest of Judgment.

Doc. No. 9 at 3(f).

On September 25, 2002, the State's motion to dismiss came on for hearing. *See* Doc. No. 9 at 3(g), Transcript of Hearing on Motion to Dismiss. Smith appeared by phone, and his attorney was present at the hearing. Smith testified at the hearing. On October 2, 2002, the district court entered an order granting the State's motion to dismiss Smith's PCR application. Doc. No. 9 at 3)(e). Although the district court cited Iowa cases holding that entry of a guilty plea waives most claims and defenses, the court did not

---

judgment was and how many days he had to file one before sentencing. The court has no information to indicate who wrote the entry or when it was written.

decide the motion to dismiss on procedural grounds, but instead considered the merits of Smith's PCR application in deciding whether the motion should be granted.

After reviewing the transcript of the plea and sentencing, the trial court concluded Smith's trial counsel was not ineffective; Smith understood the terms and conditions of his plea agreement, and his actions were voluntary and intelligent; the judge who accepted the plea and imposed sentence fully advised Smith of his rights, and ensured that Smith was fully informed of the possible consequences of entering a guilty plea; entry of the plea prevented Smith from a potential life sentence if he went to trial and was convicted; and the plea agreement and sentence were fair and reasonable under the totality of the circumstances. The court found no genuine issue of material fact existed that would require a trial, and the State was entitled to judgment as a matter of law. *Id.*

Smith appealed the dismissal of his PCR application. On November 26, 2003, the Iowa Court of Appeals reversed the district court's summary dismissal of Smith's PCR application. Doc. No. 9 at 4(e), *Smith v. State*, No. 3-684/02-1627 (Iowa Ct. App. Nov. 26, 2003). The court noted Smith had alleged his trial counsel was ineffective in persuading him to plead guilty against Smith's wishes – the type of claim that generally would require an evidentiary hearing. The court held entry of a guilty plea does not waive claims that the plea was coerced and was not voluntary. Although the court questioned whether Smith could "establish the necessary nexus between his ineffective assistance claims and his decision to plead guilty," the court held the determination could not be made as a matter of law. *Id.* Consequently, the court reversed the trial court's summary dismissal of the case and remanded for a hearing, holding as follows:

> We believe the district court impermissibly weighed the evidence in ruling there was no support for Smith's ineffective assistance claims. His assertions that his counsel incorrectly advised him that he could raise all issues normally appropriate in an appeal by a postconviction relief action, that counsel did not adequately prepare for trial, and that counsel misadvised

> him in other respects raise issues which arguably affected
> Smith's decision to plead guilty.  Smith also claims misadvice
> by the trial court at the guilty plea proceeding regarding the
> burden of proof, which was not corrected by counsel.  These
> issues are not resolvable as a matter of law on the record
> available to the district court and thus [are] not appropriate for
> summary disposition.

*Id.*

After remand, the State filed an Answer to Smith's amended PCR application, and on June 10, 2004, the matter came on for trial in the district court.  *See* Doc. No. 9 at 3(i), Transcript of PCR Trial.  On July 15, 2004, the district court entered an Order overruling Smith's amended PCR application, finding Smith had failed to show his trial counsel's performance was deficient in any way, or that the result of the proceedings would have been different absent his counsel's alleged ineffectiveness.  Doc. No. 9 at 3(k).

Smith appealed the district court's decision overruling his amended PCR application.  On January 24, 2005, Smith's attorney filed a motion to withdraw pursuant to Iowa Rule of Appellate Procedure 6.104, which allows counsel to withdraw when, "after conscientious investigation of the entire record," counsel believes "the appeal is frivolous and that counsel cannot, in good conscience, proceed with the appeal[.]"  Ia. R. App. P. 6.104(1).  *See* Doc. No. 9 at 4(f), Motion for Leave to Withdraw.  On January 28, 2005, Smith filed a *pro se* request for appointment of another attorney to represent him in the appeal.  Doc. No. 9 at 4(g).

On September 12, 2005, the Iowa Supreme Court granted Smith's counsel's motion to withdraw, and dismissed the appeal as frivolous.  Doc. No. 9 at 4(h).  Procedendo issued on December 23, 2005.  Doc. No. 9 at 4(i).

Smith filed an application to proceed *in forma pauperis* and a petition for writ of *habeas corpus* in this court on February 6, 2006.  Doc. No. 1.  *In forma pauperis* status

was granted by the court, and the petition was docketed on March 30, 2006. Doc. No. 3. In the petition, Smith claims his trial attorney was ineffective in the following respects:

> A.   Prior to my plea of guilty, my attorney Robert Thompson failed to advise me of any defense other than general denial. If my attorney Robert Thompson had informed me of the defense based on Incidendal [sic] Rule, page 70, I would have went [sic] to trial, relying on that defense and been acquitted.
>
> B.   During my plea and sentencing hearing, my attorney Robert Thompson did not advised [sic] the court, prior to rend[er]ing judgment, that no factual basis existed in the record, nor did "Judge Clark," sentencing Judge say where he was relying on to sustain guilty plea under the facts of the charges. He Mr. Robert Thompson was ineffective for failing to do so.

*Id*. at 5-6.

An attorney was appointed to represent Smith in this court. Smith's attorney restated these claims in the merits brief as follows:

> Trial counsel rendered ineffective assistance of counsel when they failed to effectively inform their client on issues regarding the charged crimes, and plea and sentencing procedures.
>
> A.   The guilty plea was entered incorrectly, and against the standards as set forth in *North Carolina v. Alford*.
>
> B.   Petitioner was not properly informed in regard to the plea he entered, therefore it was not entered intelligently, knowingly and voluntarily.

Doc. No. 16.

Smith's claims raised in this action have been exhausted and are ripe for consideration by this court.

### *Guilty Plea Proceedings*

The proceedings at Smith's plea hearing, which occurred on August 22, 2001, are directly relevant to his claims in this action, and will be set forth here in full.

8

THE COURT: Let the record reflect that this is <u>State of Iowa vs. Wayne Smith</u>, FECR89868. The matter is scheduled for trial this morning. I was just about to swear in – have the clerk swear in the jury panel which is still available at this time and I was informed that the defendant wishes to enter a plea.

Mr. Smith, is it correct at this time that you wish to change your plea and enter a plea of guilty?

THE DEFENDANT: Yes.

THE COURT: And is what you are about to do being done freely and without any threats or coercion?

THE DEFENDANT: Yes.

THE COURT: How old a man are you?

THE DEFENDANT: Forty-three.

THE COURT: And what is the extent of your education?

THE DEFENDANT: High school GED.

THE COURT: Do you have any trouble reading, writing or understanding the English language?

THE DEFENDANT: No.

THE COURT: Are you presently under the care of a physician, psychiatrist or psychologist?

THE DEFENDANT: No.

THE COURT: Are you at this time under the influence of any medication of any kind?

THE DEFENDANT: No.

THE COURT: Have you, within the last six months, been hospitalized –

THE DEFENDANT: No.

THE COURT: -- for the treatment of any physical or mental condition?

THE DEFENDANT: No.

THE COURT: I'm by law required to personally advise you of your rights and determine that you're pleading guilty because you are, in fact, guilty and there's a factual basis for your plea. Do you understand that?

THE DEFENDANT: Could you explain it again?

THE COURT: All right. I'm required to personally advise you of your rights and to determine that you are pleading guilty because you are, in fact, guilty or because you consider it in your best interest to plead guilty.

THE DEFENDANT: I consider it in my best interest.

THE COURT: Okay.

MR. THOMPSON [attorney for Smith]: This is an Alford plea, Your Honor.

THE COURT: If at any time you don't understand any of my questions, just interrupt me. You're free to consult with your attorneys outside my presence if you choose to do so. If at any time you decide you don't want to continue your plea, we'll just go downstairs and begin jury selection. You understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Are you presently on probation or parole?

THE DEFENDANT: No.

THE COURT: Are any other charges pending against you in any court anywhere?

THE DEFENDANT: No.

THE COURT: You've received a copy of the amended trial information in this case, have you not, sir?

THE DEFENDANT: Yes.

MR. FERGUSON [Black Hawk County Attorney]: Your Honor, what we need to do, there was an amended trial information filed on December 22, 1999, charging the defendant with four counts. At this time, for the purposes of this plea, it's our understanding there is a plea agreement, so for the purposes of a plea, we would move orally to amend, first of all, Count I, the charge of Kidnapping in the First Degree, to the

offense – lesser included offense, Kidnapping in the Third Degree, a Class C Felony, and being an habitual offender.

Count II would be amended from Sex Abuse in the Second Degree to Sex Abuse in the Third Degree and being an habitual offender.

MR. THOMPSON: No, I think – that's Assault With Intent.

MR. FERGUSON: All right, that's fine. We would amend Count II to Assault with Intent to Commit Sexual Abuse Causing Serious Injury and being an habitual offender.

Count III would remain as charged and at the conclusion of the plea, we would move to dismiss Count IV. The habitual offender's offenses would be the same as in Count III for both Count I and Count II.

THE COURT: Okay, thank you.

Do you understand that your charges as a result of your plea agreement, sir, are being amended accordingly?

THE DEFENDANT: Yes.

THE COURT: All right. Do you stipulate and agree that the minutes of testimony would establish your guilt beyond a reasonable doubt as to each of these charges?

THE DEFENDANT: No.

THE COURT: Do you agree that any evidence which you or your witnesses would present before a jury would not necessarily overcome guilt beyond a reasonable doubt?

THE DEFENDANT: Yes.

THE COURT: Okay.

Mr. Thompson, Mr. Rogers [co-counsel for Smith], do you know of any defenses, other than general denial, that could affect the outcome of the case?

MR. THOMPSON: No, Your Honor, I do not.

MR. ROGERS: No, Your Honor.

THE COURT: And Mr. Smith, are you satisfied with the services of your attorneys?

DEFENDANT: Could have been better. It could have been better.

THE COURT: Well, are you satisfied this morning for purposes of the plea?

THE DEFENDANT: Yeah.

THE COURT: I have indicated to counsel, and I will indicate to you now, Mr. Smith, that I will be bound by the plea agreement in this case and, Mr. Ferguson, you have stated the plea negotiations as to the reduction from the Class A Felony to the Class C Felony, the Class B Felony to the Class C Felony and charge three as amended and dismissal of Count IV. Were there any agreements as to sentencing?

MR. FERGUSON: Yes, Your Honor. The parties have agreed to the following; that the sentences imposed on Count I, Count II and Count III as amended and being an habitual offender would be 15 years each and that each sentence would be consecutive to one another for a total sentence of 45 years.

Additionally, the parties have agreed to the following which goes beyond the sentence, per se, would be as follows. First of all, as part of this plea agreement, the defendant can enter an Alford plea. Secondly, that the defendant will have an opportunity to visit with family in a secure setting for no more than 30 minutes, that being his wife, stepson and son at the Black Hawk County Jail, arrangements made at the jail for that visitation. Thirdly, that there would be no appeal filed. Additionally, defense counsel is free to request that the Court place or the Court, excuse me, the defense counsel is free to request the Court at the time of sentencing for placement of the defendant in Mount Pleasant. Our position to the Court would be at that time that the Department of Corrections would determine his placement based upon their criteria and placement at the institution they feel is appropriate.

Other than those agreements, there are no further agreements in this case other than what's already been stated on the record and these amended charges.

THE COURT: All right. Is that your understanding, Mr. Smith?

MR. THOMPSON: Mr. Ferguson, it's my understanding that other than the statutory letter that you're required to write on sentencing, that you would not also actively seek out the parole board concerning Mr. Smith?

MR. FERGUSON: Your Honor, as the Court is well aware, pursuant to Iowa Code, the prosecuting attorney should send a letter to the parole board upon sentencing. We intend to do that in this case. We would not initiate contact beyond that letter for or requesting anything other than what we've requested in our letter after our letter has been sent. However, it should be clear both [to] the defendant and as part of this record that victims have a right to be notified of parole hearings and that no way does this restrict their ability to participate, but we would not initiate any contact with the parole board after our letter. However, if we are contacted by the parole board, I think it's only appropriate that sometime in the future we would respond to that. But we would not initiate it and that would be our agreement that we would not do so.

THE COURT: Okay, thank you.

Mr. Smith, is that your understanding?

THE DEFENDANT: Yes.

THE COURT: If you continue in your desire to plead guilty, there are certain rights that you'll give up and I'll go through those with you now. If you plead not guilty, you're entitled to a speedy and public trial. We were scheduled to begin that this morning. At trial, you, together with your attorney, would have the opportunity to select a jury of 12 people. We would select a jury of 14, actually, with two alternates. Cross-examine witnesses, present evidence, if any, on your behalf and make arguments of law to the Court and arguments of fact to the jury. If you plead guilty, these rights are lost and you will not have this opportunity. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you do not plead guilty, there's a privilege against self-incrimination, meaning you can't be forced to testify. If you didn't testify, this could not be used against you, nor could your choice not to testify be commented upon by the county attorney. However, upon pleading guilty, you give up this right. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: At trial, the witnesses whose names are on the information would have to come into court, take the witness stand and testify in front of you and be cross-examined by your attorney. If you plead guilty,

no witnesses will be brought into court and you'll not be allowed to cross-examine them. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you stood trial, you also would be entitled to use the subpoena power of the Court to compel witnesses to appear and testify should you – if they knew something about your case and could give fact testimony. But by pleading guilty, you give up this right as well. You understand that, sir?

THE DEFENDANT: Yes.

THE COURT: Now, understanding all these rights, if you plead, do you understand that and do you now waive each of the rights that I have just explained to you?

THE DEFENDANT: Yes.

THE COURT: Do you still wish to plead guilty?

THE DEFENDANT: Yes.

THE COURT: Do you know what the maximum and minimum penalties are for the crimes as has been stated, 15 years on each? You understand that, sir?

THE DEFENDANT: Yes.

THE COURT: You understand that there is a fine associated with these and that fine can be suspended.

Any objection to that, Mr. Ferguson?

MR. FERGUSON: No, Your Honor.

THE COURT: Fines on Class C Felonies are a thousand, minimum and those would be suspended in your case.

Is that your understanding of the penalties?

THE DEFENDANT: Yeah. I didn't know it, but yeah, it is.

MR. FERGUSON: Your Honor, just for the purposes of the record, there's a three-year minimum as a habitual offender, pursuant to Chapter 902.

THE COURT: Thank you. You understand that, Mr. Smith?

THE DEFENDANT: Yes.

THE COURT: Okay.

MR. FERGUSON: On each of the offenses.

THE COURT: Right. So there would be a total of nine years minimum with the consecutive sentences. You understand that, Mr. Smith?

THE DEFENDANT: No, but you go ahead.

THE COURT: All right. Well, let me make sure you understand it because it's something you have to understand.

The agreement is that you be sentenced to a term of 45 years, 15 years on each count consecutive. You would have to serve the minimum three years on Count I, you would have to serve the minimum three years on Count II and you would have to serve the minimum years on Count III consecutively. So there would be a minimum sentence of nine years as a result of your plea agreement of the 45. That is not to say that you won't have to serve more than nine years, but it is to say that you will have to serve a minimum of nine years consecutively. Do you understand that, sir?

THE DEFENDANT: Yeah.

THE COURT: Thank you. I've indicated that I will be bound by this agreement.

Count I as amended requires proof that on the dates in question you intentionally confined or removed the victim with the intent to inflict serious injury on the person or to subject the person to sexual abuse as at least the facts of this trial information or the minutes of testimony would support; that you knew that you did not have the victim's consent or authority to do so and that you did so with the specific intent of secretly confining the victim.

You understand those elements?

THE DEFENDANT: Yes.

THE COURT: All right. On Count II, as amended, the State would be required to prove that you intended to commit assault and that you intended to commit sexual abuse and that serious injury resulted. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right. And on Count III, the State would have to prove that you committed an act and that you intended to cause serious injury and that serious injury was caused. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right. Do you agree that there is sufficient evidence and testimony as to each of these elements which I have explained to you for which a jury could find you guilty?

THE DEFENDANT: I believe there's a possibility.

THE COURT: Pardon me?

THE DEFENDANT: I'll agree that there's a possibility.

THE COURT: All right. Do you agree that your best interests are served by this plea and that you have nothing to gain by going to trial? In fact, you could have well much to lose by going to trial, considering that Count I, as it's pled, calls for life imprisonment?

THE DEFENDANT: Would you repeat that again?

THE COURT: Sure. Do you agree that your best interests are served by this plea?

THE DEFENDANT: Yes.

THE COURT: Do you agree that you would have much to lose by going to trial if the jury found you guilty of the offenses as charged?

THE DEFENDANT: Yes.

THE COURT: All right. And it's because of that, am I correct in understanding, that a trial is not what you desire this morning?

THE DEFENDANT: Yes.

THE COURT: And you've discussed this with your counsel, but this is your decision; is that right, Mr. Smith?

THE DEFENDANT: Yes.

THE COURT: And are you doing this voluntarily in light of what you stand to lose by going to trial and the evidence against you at this point?

THE DEFENDANT: In light of what I stand to lose by going to trial.

THE COURT: Okay. Is it still your desire to plead guilty?

THE DEFENDANT: Yes.

THE COURT: What is your plea, then, to the charge of Kidnapping in the Third Degree?

THE DEFENDANT: Guilty.

THE COURT: What is your plea to the charge of Assault with Intent to Commit Sexual Abuse and Causing Serious Injury?

THE DEFENDANT: Guilty.

THE COURT: What is your plea to the charge of Willful Injury?

THE DEFENDANT: Guilty. Wait, wait, wait. That ain't on there, is it?

MR. THOMPSON: Yeah, three.

THE DEFENDANT: Guilty.

THE COURT: And what is your plea to – and do you agree that on August 26, 1988, you were convicted of forgery and were sentenced to five years in prison?

THE DEFENDANT: Possibly.

THE COURT: Pardon me?

THE DEFENDANT: Possibly and probably.

THE COURT: Okay. That was in – the Court, unless there's objections, would take judicial notice of criminal cause D7X013907 in the Black Hawk County District Court of your conviction in that regard. Do you agree, sir, that that habitual offender enhancement is available in your case?

THE DEFENDANT: Yes.

THE COURT: All right.

MR. FERGUSON: Your Honor, just for the purposes of the record, perhaps also have him acknowledge that he is one, in fact, Wayne Smith that was convicted in cause No. 1562 and 13907 and that the habitual offender – there's two offenses for the habitual offender.

THE COURT: Thank you.  Yes, I'm sorry, counsel.

Do you agree also, sir, that you were convicted in Black Hawk County on the 23rd day of May, 1980 of Sexual Abuse in the Second Degree and sentenced as a result of that conviction?

THE DEFENDANT: Yes.

THE COURT: Thank you.

Mr. Smith, I will find at this time that you're voluntarily entering this plea, that you fully understand your rights and that you fully understand the consequences of your plea.  I'm going to find that you've concluded that your interests require the entry of a guilty plea and the record based on the minutes of testimony contains strong evidence of actual guilt.  I'm going to find that you have nothing to gain by trial, much to gain by entry of a plea; namely, you are avoiding a life imprisonment sentence if you were convicted of Count I; that you're avoiding a 25-year sentence on Count II.

Now, it's my understanding that part of the plea agreement and that it's your wish today to request immediate sentencing; is that correct?

THE DEFENDANT: No.  That's not correct.

MR. THOMPSON: I thought we were going to do it all today.

THE DEFENDANT: Nope, I'm not going to agree to sentencing.

MR. FERGUSON: Your Honor, that was part of the understanding that we would proceed to immediate sentencing since we are prepared to go forward with the trial.  We would make arrangements for Mr. Smith if he needed to be here to visit with his family and make those arrangements, as well as he'll have to have a PSI follow him, so he needs to fill out that information, so if that's the issue, fine, but if he's not going to proceed to immediate sentencing, that was part of the understanding with counsel.

THE COURT: Do you want time to consult with Mr. Smith, because other than that, I mean, I've made the jury wait another 20 minutes, here, and if you want to go to trial, then we'll have to do that in the next couple minutes because I can't make the jury wait any longer.

(Wherein a recess was taken at 10:50 a.m. and court recommenced at 10:53 a.m.)

THE COURT: All right. The record may reflect that counsel and the defendant are in the courtroom.

Mr. Smith, again, under the law, prior to the Court pronouncing sentence, you do have the right to request a pre-sentence investigation in which your background and other information which would aid the Court in assessing the appropriate sentence, would be obtained. If you proceed to immediate sentence, you would waive or give up this privilege and no presentence investigation would be undertaken until after these matters and I would order that such an investigation be completed and filed within 60 days.

Also, if you proceed to immediate sentencing, you give up the right to file what's known as a motion in arrest of judgment. By a motion in arrest of judgment, you attack any alleged defects or mistakes that may have been made during the plea proceeding that we have just completed. By not filing a motion in arrest of judgment, you would not be able to raise any alleged defects or mistakes in the plea proceedings in any appeal that you might take at a later time to the Iowa Supreme Court. Do you understand that, sir?

THE DEFENDANT: Yes.

THE COURT: Part of your plea agreement also is that you're giving up the right to appeal?

THE DEFENDANT: Yes.

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Understanding these privileges and what you will be giving up, do you still wish the Court to pass immediate sentence?

THE DEFENDANT: Yes.

THE COURT: Okay. The Court will find at this time that Mr. Smith has knowingly and intelligently waived the right of time for sentencing, waived the right to file a motion in arrest of judgment and has requested me to proceed to immediate sentencing in this case.

Is there anything that you would like to say, sir, before I enter judgment in your case?

THE DEFENDANT: Yes.

THE COURT: You may do so at this time.

THE DEFENDANT: I'd like to say, Your Honor, that I'm not guilty of kidnapping. I never was guilty of kidnapping, first degree, second degree or third degree. [The victim] was free to leave any time she chose. I went to bed and went to sleep.

I'm not guilty of sexual abuse. The thing I am guilty of, Your Honor, and I'm fully guilty of is domestic abuse. We got to fighting. True. We had sex. I was living there. And I feel injusticed [sic] as a man when I have to come into court to fight for his life based on lies, you know what I'm saying? Because she didn't want her mom to know what type of person she was, she gonna put me in jail for the rest of my life for something I didn't do.

I'm willing to go to prison, Your Honor. I've been in prison before. I'm willing to go back to prison, you know what I'm saying, but as the Lord is my witness, I did not do the sexual abuse and the kidnapping. They was not – she could have left at any time. She got up that morning went – and went in there, took care of Jordeyn that morning, she followed me out the door and her mother come through the window. She followed me out the back door and asked me specifically, what am I gonna tell my mom? You know what I'm saying?

I'm pleading guilty because, Your Honor, under Black Hawk County statutes, 99 percent chance I would have got found guilty of something I didn't do. I want the Courts to know right now, Your Honor, this is an injustice and a man will be – that the State would put these charges on a person just because they had the power to do that, Your Honor. I don't have the means – I'm a poor black men, yeah. But I also know Your Honor, I don't mind going to prison for something I did do. As my record states, I did go to prison a number of times for something I did do, but I did not kidnap [the victim]. I did not sexual[ly] abuse [the victim]. And I'm pretty sure her mom and dad know the truth.

THE COURT: All right. Now. Mr. Smith, I have taken the better part of the last 40 minutes explaining to you your rights.

THE DEFENDANT: I'm pleading guilty, Your Honor, because it is in my best interest. It's in my best interest.

THE COURT: All right. Well, having reviewed the minutes of testimony, I agree with you. I think the minutes of testimony present strong evidence of guilt. I think you're right, that if the witnesses take the stand and testify to what their statements are in these minutes of testimony, that there is strong evidence of guilt and that a jury certainly could find you guilty.

With that, I have agreed to be bound by this plea agreement and agreed to sentence you to the agreed sentence. I will say that I believe you have chosen the better course here. When you tell me that it's in your best interest, it is clear to me that that is the truth. It is in your best interest based on what penalty you would suffer if you went to trial on these charges and were found guilty.

MR. FERGUSON: Your Honor, I'm sorry to interrupt you. Pursuant – the State does not have any statement to make, other than the plea agreement. However, the victim . . . is here and I think pursuant to statute, she has a right to make an oral victim impact statement to the Court. I know the sentence has been agreed to, but she is here and she would like to at least orally, from back there, make whatever statement she would like to make.

THE COURT: All right.

.   .   . [Victim impact statement.]

.   .   .

THE COURT: At this time the Court will adjudge the defendant guilty of the crime of Kidnapping in the Third Degree in violation of Iowa Code Section 710.4, enhanced as being an habitual offender pursuant to Iowa Code Section 902(8). I will adjudge the defendant guilty of the crime of Assault with Intent to Commit Sexual Abuse in violation of Iowa Code Section 709.11 as enhanced by Iowa Code Section 90 or I'm sorry, 902.8 and finally, I'll adjudge the defendant guilty of Willful Injury and being an habitual offender in violation of Iowa Code Section 708.4 and Iowa Code Section 902.8.

It is the sentence of the Court under those Code sections that the defendant be confined for a period of not more than 15 years on Count I with a mandatory minimum of three years; that he be confined for a period of 15 years on Count II consecutive to Count I with a mandatory minimum of three years; that he be confined for a period of not more than 15 years on Count III with a mandatory minimum of three years consecutive to Counts

I and II. The defendant is committed to the custody of the director of the Department of Corrections. The Sheriff is directed to deliver the defendant as agreed in a couple of weeks.

The defendant will receive credit for time served. The Court will impose fines of $1,000 on each of the counts and suspend the fines. The costs will be assessed against the defendant. The defendant will be ordered to make restitution as required by Chapter 910 and also make restitution for court appointed attorney's fees.

The Court determines the sentence to be appropriate because of the nature of the crimes, the defendant's past record and the plea bargain with the county attorney's office.

You are informed, sir, that this is a final judgment in your case. The agreement is that you not appeal. In the event an appeal were taken, notwithstanding the agreement, the Court would set an appeal bond of 100 thousand on each count.

Oh, wait a minute. Are these –

MR. FERGUSON: Your Honor, under Chapter 811 –

THE COURT: – they aren't bondable?

MR. FERGUSON: Right. I wasn't sure about all three of them.

THE COURT: As these are forcible felonies, the defendant is not bailable. There will be no bail.

I will order the presentence investigation be prepared and filed within 60 days. I will include in my order, pursuant to the agreement of counsel, that the Court will recommend to the Department of Corrections that the Department give primary consideration to the Mount Pleasant facility.

MR. THOMPSON: Thank you.

THE COURT: Is there anything else?

MR. FERGUSON: Your Honor, just for the purposes of the record, I believe the Court indicated at the time of pronouncing sentence on Count II, it was Assault with Intent to Commit Sexual Abuse –

THE COURT: – and causing serious injury.

MR. FERGUSON: Correct, Your Honor.

THE COURT: I'm sorry, I misspoke. I didn't include that, but that is the Class C Felony.

MR. FERGUSON: Thank you, Your Honor.

THE COURT: Do counsel wish to make any further record?

Judgment and sentence will be entered accordingly.

Doc. No. 9 at 1(*l*), Transcript of Plea and Sentencing.


### *Post-Remand Trial on PCR Application*

At the trial on Smith's application for postconviction relief, which occurred on June 10, 2004, Smith testified he relied on his attorneys' advice in deciding to plead guilty to the reduced charges. According to Smith, he met with his attorneys the morning when trial was to begin, and his attorneys told him there were "a bunch of old white people" on the jury panel who would find him guilty. They advised Smith to plead guilty to the reduced charges to avoid the life sentence he would receive if the jury found him guilty of first-degree kidnapping. He stated his attorneys never reviewed the elements of the kidnapping offense with him, and never explained to him what a lesser-included offense was or what lesser-included offenses applied to the kidnapping charge. He also stated his attorneys had prepared virtually no defense to the charges and they were not prepared to go forward with the trial. Doc. No. 9 at 3(i), pp. 6-14.

Smith stated if he had understood the elements of first-degree kidnapping and the lesser-included offenses of first-degree kidnapping, he would not have pled guilty to third-degree kidnapping and he would have proceeded to trial. According to Smith, from what his attorneys told him, he believed he had no choice but to enter a guilty plea. He stated he maintained his innocence from the very beginning, telling "everybody that would listen from day one [that he] wasn't guilty." He questioned his attorneys about their advice, expressing his incredulity that he had to plead guilty to a crime he did not commit in order

to avoid a potential life sentence. He stated he and his attorneys talked for about fifteen minutes, and his attorneys continued to maintain that the "old white people" were going to find him guilty if he went to trial.

Smith's attorneys explained he could enter an *Alford* plea, which Smith understood to mean that he would not have to admit his guilt, but he would have to admit the State "might have enough evidence to find [him] guilty." He stated he was concerned about going to trial because his attorneys did not appear to have a defense prepared, and he agreed to enter an *Alford* plea at the urging of his attorneys. *Id.*, pp. 14-18.

Smith further stated his attorneys told him he could raise any issues relating to the plea hearing in a postconviction action. *Id.*, pp. 18-19.

Smith indicated he expressed his concerns about his attorneys to the court during the plea proceeding when he told the court his counsel's representation "[c]ould have been a whole lot better." *Id.*, pp. 19-20.

On cross-examination, the State established that Smith was no stranger to the criminal justice system and how cases move through the courts. He stated his attorneys initially told him they thought they could "beat" the kidnapping charge. He acknowledged that his attorneys filed motions on his behalf, took at least one pretrial deposition, and retained the services of an investigator and an expert in DNA analysis. *Id.*, pp. 24-27. However, he stated his attorneys "didn't even file a Bill of Particulars." *Id.*, p. 25.

On redirect examination, Smith stated he has no training in the law, and he did what his attorneys told him to do. *See id.*, pp. 27-40.

Smith's trial attorneys, Robert W. Thompson and Herbert Rogers, Sr., testified on behalf of the State. At the time he represented smith, Thompson had practiced law for thirty-two years, and about sixty percent of his practice was devoted to criminal defense work. He had defended fifteen to twenty murders or other Class A felony cases. He stated several other attorneys had preceded him in representing Smith, and he obtained the

discovery that had been developed by those attorneys, which included depositions and pretrial motions.

Thompson stated he and Rogers had "extensive consultation" with Smith. As the case progressed, it appeared to Thompson that the case was "headed directly to trial [without] much of an opportunity to negotiate anything." Thompson indicated Smith was "heavily involved" in the case, "taking an extremely active interest in [the case, and] pointing out areas that he wanted investigated or looked at." Smith's wife also was involved in pretrial preparation of the case. According to Thompson, Smith "was always fully advised of what was going on and where . . . things were standing." For a layperson, Thompson thought Smith appeared to be well-versed in the law and quite familiar with the criminal justice system, and he "certainly" had knowledge of lesser-included offenses. He stated Smith also understood what the State had to prove in order to convict him. *Id.*, pp. 43-49.

Regarding the first-degree kidnapping charge, Thompson explained to Smith that the State would have to prove the victim was not free to leave; "she wasn't able to remove herself voluntarily." He did not recall using the word "confinement" but he did explain what confinement meant; i.e., that the victim was not free to leave. Thompson stated Smith asked questions whenever he did not understand something. Thompson characterized his communications with Smith as "quite open and honest. *Id.*, pp. 49-52.

Thompson stated that during his representation of Smith, Smith admitted he and the victim had gotten into a fight and he was guilty of domestic abuse. Smith stated he had hit the victim or slapped her, but the burns she sustained were the result of "her own stumbling." *Id.*, pp. 52-53.

According to Thompson, he advised Smith that in his opinion, it was probable the State would convict him of kidnapping in the first degree. Thompson "requested the opportunity to attempt to negotiate some sort of a plea arrangement between the prosecutor

and [Smith]," and Smith agreed. Negotiations were ongoing right up until jury selection was scheduled to begin for Smith's trial. Thompson stated the negotiations became "extremely intense" because he was trying to find a way to save Smith from receiving a sentence of life in prison. Thompson did not discuss with Smith the pros and cons of accepting a plea agreement because he believed Smith already "knew about as much about this particular case and the law and what he was facing as any of the attorneys that had represented him." Thompson stated he and Rogers were fully prepared to go to trial if Smith decided not to plead. However, he indicated Smith filed an ethics complaint against Rogers that "substantially took the wind out of his sails," with the result that Thompson felt "heavily burdened" because he was "bearing the majority of doing all of the tasks" to prepare for trial. Thompson was prepared for jury selection and cross-examination of witnesses, and he had filed motions in limine. *Id.*, pp. 54-56.

Thompson stated he had a very distinct memory of the events leading to Smith's decision to plead guilty to the reduced charges. He knew there were certain concessions Smith wanted, one of which was the opportunity to visit with his family prior to beginning his sentence. The night before trial, Thompson and Smith "had quite a lengthy conference," when Smith gave Thompson instructions about what terms would be acceptable to him. Thompson communicated with the prosecutor to try to secure those concessions. In addition to visitation with his family, Smith also wanted the State to agree not to take any action to oppose his parole when the time came. According to Thompson, both of these terms were raised by Smith; they were not the result of suggestions made by his attorneys. *Id.*, pp. 57-60.

Thompson described the events that took place on the morning trial was scheduled to begin, as follows:

> Prior to jury selection, we met in the – the jury room
> behind the large courtroom on this floor and the last negotiated
> offers were conveyed to Mr. Smith, which I thought were at

26

> least close enough that he might well accept them. Mr. Smith did not at that juncture accept that negotiation – those negotiations.
>
> We proceeded into the courtroom, and the jury pool was there; and Judge Clark came in. We were seated at the table that looks directly at the bench. Mr. Rogers was to Mr. Smith's left, and I was to Mr. Smith's right. Judge Clarke proceeded to discuss with the jury his speech about the fortunateness [sic] of living in the United States, how we're not being tried in a police state, when I received a jab in my ribs by Mr. Smith who said, "I'll take the deal. Tell him to stop."
>
> I turned to Mr. Smith and I said, "Wait. He's not at a good stopping point." Judge Clarke continued and Mr. Smith again jabbed me and said, "I'll take the deal. Tell him to stop," becoming a little more impatient. I said, "Hold on."
>
> A third time Mr. Smith jabbed me and said, "I'll take the deal. Tell him to stop." It was shortly after that we came to a juncture or Judge Clarke came to a juncture in his speech where I asked to approach. I advised him that my client had indicated he would take the deal, whereupon we adjourned to the fourth floor for the plea proceeding.

Doc. No. 9 at 3(i), pp. 60-61.

Thompson stated there was one problem during the plea, when Smith indicated he did not want to proceed directly to sentencing. Thompson could not recall if he had talked with Smith prior to the plea hearing about proceeding immediately to sentencing. At the time Smith expressed his unwillingness to be sentenced immediately, the court took a brief recess to allow Smith to consult privately with his attorneys. Thompson stated the following took place:

> The only people left in the courtroom were Mr. Rogers, Mr. Smith, and myself; and whereupon I asked Mr. Smith in a rather impatient way what he wanted.

And Mr. Smith became upset and advised me not to talk to him like that, "Do not raise your voice to me again like that," and I said to him, "Wayne, what do you want?" And his response was, "I want your fat ass off my case." It was at that juncture that Mr. Rogers piped in and advised him, Mr. Smith, that it would not make any difference whether we went to immediate sentencing or not because it was a[n] agreed-upon disposition and the Court had agreed to be bound by that disposition. So the judge came back in, we concluded it, and that was the – the end of it.

*Id.*, pp. 63-64.

Thompson testified it was totally Smith's decision to plead guilty, and not his attorneys' decision. Thompson stated he was "absolutely surprised when [Smith] jabbed [him] and said, 'I'll take the deal. Tell him to stop.'" *Id.*, p. 64.

Thompson stated he never told Smith the jury was "a bunch of old white people that were going to find him guilty." Rather, he told Smith, "'Wayne, I've looked at that jury; and they don't look real friendly to me.'" Smith responded, "'They looked pretty good to me, Bob.'" *Id.*

Thompson explained to Smith that part of the plea agreement was a provision that he could not file an appeal. According to Thompson, Smith understood that term of the agreement. Thompson did not recall having any discussions with Smith about PCR proceedings.

Regarding the specifics of the plea proceeding, Thompson stated he did not go over, "in so many words," what the judge would say during the plea hearing. He indicated Smith "knew what . . . the deal was and he knew what . . . he was pleading to. And he could even do an Alford plea, which is, in essence, what he did was an Alford plea[.]" *Id.*, p. 66. Thompson did not recall telling Smith specifically that the judge would have to find a factual basis to accept the plea. *Id.*

Thompson stated he perceived Smith as being one of the most intelligent criminal defendants he has ever represented, and Smith appeared to have a full understanding of all of the proceedings.

On cross-examination, Thompson explained that if the trial had proceeded, his strategy was to "put[] the victim on trial and what the victim's statements had been; attempting to show the relationship that the victim's mother – her great distaste and hate for Mr. Smith. There certainly may have been a basis for [the victim] to exaggerate, if not right out lie." *Id.*, p. 68. Smith told his attorneys the victim "was free to go whenever she wanted to; and there was evidence . . . that would support that[.]" *Id.*, pp. 68-69. Thompson recalled there had been witnesses to the fact that Smith was intoxicated on the evening the attack allegedly began, and evidence that the victim got up the next morning and took care of her child. He planned to show that "none of this stuff really . . . ent south for Mr. Smith until [the victim's] mother showed up." *Id.*, pp. 68-69. His defense strategy included showing that the victim was free to leave the house and chose not to. He viewed this as part of Smith's general denial of the charges against him. *Id.*,

pp. 69-70.  Thompson did not recall discussing the "incidental rule"[3] with Smith, or that Smith had questioned him about that type of defense.  *Id.*, pp. 70-71.

On redirect examination, Thompson reiterated that the strengths and weaknesses of Smith's case were discussed fully with Smith, and he "knew very well" the strengths and weaknesses of his case.  He reiterated that Smith "literally shocked [him]" when he said he wanted to accept the plea deal, and that decision was totally Smith's.  *Id.*, pp. 74-75.

Herbert Rogers, Sr. testified that seventy to eighty percent of his practice is devoted to criminal defense work in Polk and Black Hawk Counties.  He represented Smith as co-counsel initially with attorney Jim Metcalf, and then continued as co-counsel when Thompson was appointed to replaced Metcalf.  He stated Smith's attorneys, collectively,

---

[3]The parties' references to the "incidental rule" relate to the requirement under Iowa law that "[t]he confinement or removal necessary to sustain a conviction [for kidnapping] must be more than incidental to the commission of the underlying offense of [the underlying crime]."  *State v. Ledezma*, 549 N.W.2d 307, 311 (Iowa Ct. App. 1996) (citations omitted).  The Iowa Court of Appeals observed:

> In order for the confinement or removal to have independent significance one of the three following criteria must be met.  The confinement or removal must:
>
> 1. significantly increase the risk of harm to the victim;
> 2. significantly lessen the risk of detection; or
> 3. significantly facilitate escape following the completion of the offense.
>
> [State v.] Rich, 305 N.W.2d [739,] 745 [(Iowa 1981)].  A broader interpretation of removal and confinement would produce unjust results since extremely disparate penalties may exist between the kidnapping charge and the underlying crime.  *Id.*

*Id.*

With regard to a charge of kidnapping coupled with a charge of sexual abuse, the Iowa Supreme Court has held that "[a]lthough no minimum period of confinement or distance of removal is required for conviction of kidnapping, the confinement or removal must definitely exceed that normally incidental to the commission of sexual abuse.  Such confinement or removal must be more than slight, inconsequential, or an incident inherent in the crime of sexual abuse so that it has a significance independent from sexual abuse."  *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981).

This requirement that the confinement must be more than incidental to commission of the underlying crime has come to be known as the "incidental rule."  *See, e.g., State v. McGrew*, 515 N.W.2d 36, 39 (Iowa 1994).

filed numerous motions, did pretrial discovery, and conducted an ongoing investigation of the case up to the time of trial. *Id.*, pp. 77-79.

Like Thompson, Rogers stated Smith was actively involved in preparing his case, noting Smith "always had something to contribute." *Id.*, p. 79. He indicated Smith frequently commented on what his attorneys were or were not doing, and they discussed trial preparations and defenses with him. *Id.*, pp. 79-80.

Rogers recalled the events that occurred on the morning of trial as follows:

> . . . I do know that we were in the courtroom and that the judge was addressing the jury or the – the – the panel, explaining to them what was getting ready to take place; and Wayne started trying to get . . . Bob Thompson's attention and saying that he wanted to take the deal, that he wanted to take the deal.
>
> And at some point Bob [Thompson] had to interrupt the judge and the – the proceedings were stopped, and the judge instructed the jury that we were going to go off the record; and that's when we went into those – to the plea negotiations again, I guess you could say.

*Id.*, p. 81. Rogers recalled that at some point, there was a break in the proceedings when Smith and Thompson had a heated discussion. Rogers testified:

> They were going back and forth about what to do, what Wayne wanted to do; and Bob, I guess, got frustrated at some point and he just said, "Okay, Wayne. What do you want to do? What do you want to do?"
>
> And Wayne said, "What I want to do is I want your – I want your fat white ass off of my case." And I don't remember what happened after that. We – There was some more discussion and, eventually, we resolved the – the thing was resolved, and Wayne entered a plea.

*Id.*, p. 83.

Rogers stated it was Smith's decision to plead guilty, and Smith understood the ramifications of his decision, as well as the potential consequences of proceeding with trial.

31

Rogers indicated that throughout his representation of Smith, he felt Smith understood the charges against him and what the State would have to prove to convict him. *Id.* Rogers did not see Thompson do anything that threatened Smith or coerced him into pleading guilty. He indicated Thompson did what Smith instructed him to do. *Id.*, p. 84. Rogers stated, "[W]e were expecting to go to trial. We didn't have any idea that Wayne was going to change his mind and ask to take the offer that the State had made." *Id.*, p. 85.

On cross-examination, Rogers stated he considered himself the "junior attorney" on the case because both Metcalf and Thompson had more experience than he had, and he deferred to their judgment. *Id.*, p. 85.

Rogers stated part of the defense they had planned for the trial was to show that the victim had engaged in sexual relations with someone other than Smith. To his recollection, there was evidence that someone else's sperm was present besides Smith's. They planned to argue no sexual abuse occurred. *Id.*, pp. 87-88. On the kidnapping charge, their defense was that the victim "was free to go and come as she pleased, that there was no kidnapping because she was – she went to work everyday. . . . She had people come to the house." *Id.*, p. 88. He stated Smith was aware of the defense they planned to present at trial. *Id.*

Rogers stated he had not defended a kidnapping case prior to Smith's case, and he has not handled a kidnapping case since that time. He had no recollection of discussing the "incidental rule" during the course of his representation of Smith. *Id.*, p. 89.

During closing argument after the PCR hearing, Smith's attorney argued the trial court erred in failing to find, specifically and expressly, that a factual basis existed for Smith's *Alford* plea. He argued "a factual basis on an Alford plea cannot be supplied by statements of the defendant. It has to be supplied by some other source, either facts related by the prosecutor, presentence report or the Minutes of Testimony." *Id.*, p. 93. He

claimed the judge's indication that he had "looked at the Minutes of Testimony" was not enough to "establish what's required by the law during the plea proceeding." *Id.*, p. 94.

Smith asked for relief in the form of dismissal of the charges against him, particularly the kidnapping charge because, according to Smith, "there was simply no confinement of this victim that was not incidental to the underlying crime itself of the assault." *Id.*, pp. 94-95. Alternatively, Smith asked for vacation of his sentence and remand for further proceedings to require the State to establish a factual basis. *Id.*, pp. 95-96 (citing *State v. Niedert*, 670 N.W.2d 432 (Table), 2003 WL 21699236 (Iowa Ct. App. July 23, 2003)).

In response, the State argued Smith had failed to meet the standard of proof required to show ineffective assistance of counsel. The State indicated, "This case was over-whelming. Very strong. At the last minute, it pled because the defendant wanted to take the deal of 45 years as opposed to life in prison without parole." *Id.*, pp. 97-98. The State argued a factual basis existed in the record based on the Minutes of Testimony. In addition, the State argued *Niedert* was not controlling and the court did not have the two options suggested by Smith (i.e., either dismissal of the charges, or vacation of the sentence and remand for further proceedings). Instead, the State suggested the only options available to the court in PCR proceedings were to either grant the petition and set the case for a new trial, or deny the petition and Smith's conviction would stand.

As noted above, the court denied Smith's PCR application, finding Smith had failed to show his trial counsel's performance was deficient in any way, or that the result of the proceedings would have been different absent his counsel's alleged ineffectiveness. Doc. No. 9 at 3(k).[4]

---

[4]During the September 25, 2002, hearing on the State's motion to dismiss Smith's PCR application, Smith also alleged his attorneys also were ineffective in telling him that he would "spend no more than four or five years in prison" on the three consecutive sentences. *See* Doc. No. 9 at 3(g), Transcript of Hearing on Motion to Dismiss, p. 12. Smith did not reassert that allegation of ineffectiveness at the post-remand trial on his PCR application, and he has not argued the issue here. The court finds that any claims not

33

### *General Standard of Review for Habeas Cases*

The court's review of Smith's petition is governed by the standards set forth by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The *Williams* Court explained:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404-05, 120 S. Ct. at 1519 (quoting 28 U.S.C. § 2254(d)(1)).

Under the first category, a state-court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*, 529 U.S. at 405, 120 S. Ct. at 1519. The Court explained:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.

*Id.*, 529 U.S. at 412-13, 120 S. Ct. at 1523. Further, "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." *Id.*, 529 U.S. at 412, 120 S. Ct. at 1523.

The second category, involving an "unreasonable application" of Supreme Court clearly-established precedent, can arise in one of two ways. As the Court explained:

---

reasserted by Smith in connection with the trial on his PCR application have not been exhausted and are procedurally defaulted.

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.*, 529 U.S. at 407, 120 S. Ct. at 1520 (citing *Green v. French*, 143 F.3d 865, 869-70 (4th Cir. 1998)). Thus, where a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," that decision "certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established federal law.'" *Id*, 529 U.S. at 407-08, 120 S. Ct. at 1520. Notably,

> Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.*, 529 U.S. at 411, 1250 S. Ct. at 1522.

If the state court decision was not contrary to clearly established Federal law, as determined by the Supreme Court of the United States, and if it did not involve an unreasonable application of that law, then the federal court must determine whether the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Here, however, Smith argues the court should apply a pre-AEDPA standard of review. He notes the Iowa Supreme Court dismissed his appeal from the denial of PCR relief as frivolous, without addressing the merits of his claims. He argues the Iowa Supreme Court had the opportunity to analyze and address his ineffective assistance of

counsel claim, and chose not to do so. He concludes that "[d]ismissal under the frivolous appeal rule is not an adjudication for the purposes of post-conviction relief," and "the AEDPA standard does not apply to any claims without a final adjudication." Doc. No. 16 at 13 & 15 (citing Iowa Code § 822.8; Iowa R. App. P. 6.104).

In making this argument, Smith apparently assumes the requirements of 28 U.S.C. § 2254(d) apply only to a state's *highest* court, or perhaps only to an *appellate* court. The statute's mandate is more broad than Smith apprehends:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of *a State court* shall not be granted with respect to any claim *that was adjudicated on the merits in State court proceedings* unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented *in the State court proceeding*.

28 U.S.C. § 2254(d) (emphasis added). The statute further provides that determinations of factual issues "made by *a State court* shall be presumed to be correct." 28 U.S.C. § 2254(e) (emphasis added).

Nowhere does the statute require that the adjudication be "a final adjudication" as required by Iowa law before a person may file an application for postconviction relief. *See* Iowa Code § 822.8. Congress clearly intended these standards to apply to any adjudication on the merits in any state court proceeding with regard to an issue that properly may be raised in a habeas action (i.e., an issue that has been exhausted or otherwise is properly

reviewable; *see* 28 U.S.C. § (b)(1)). An "adjudication on the merits" differs from the "final adjudication" contemplated by the Iowa PCR statute.

The court finds the AEDPA standard of review as explicated by the *Williams* Court applies to Smith's ineffective assistance of counsel claim in this case. Thus, the court must determine whether the last State court decision on the merits was either contrary to or involved an unreasonable application of the clearly-established federal law, or was based on an unreasonable determination of the facts in light of the evidence. Here, the last reasoned decision on the merits was the PCR trial court's order denying Smith's PCR application. *See* Doc. No. 9 at 3(k). To determine whether the PCR court's decision passes muster under *Williams*, the court first must examine the clearly-established federal law applicable to ineffective assistance of counsel claims.

### Standards for Ineffective Assistance of Counsel Claim

The standard for proving ineffective assistance of counsel was established by the Supreme Court in *Strickland v. Washington*:

> *First,* the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second*, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984) (emphasis added). The reviewing court must determine "whether counsel's assistance was reasonable considering all the circumstances." *Id.*, 466 U.S. at 688, 104 S. Ct. at 2065.

The defendant's burden is considerable, because "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, 466 U.S. at 689, 104 S. Ct. at 2065 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83 (1955)). "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." *James v. Iowa*, 100 F.3d 586, 590 (8th Cir. 1996).

Furthermore, even if the defendant shows counsel's performance was deficient, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.*, 466 U.S. at 693, 104 S. Ct. at 2067.

Thus, the prejudice prong of *Strickland* requires a petitioner, even one who can show that counsel's errors were unreasonable, to go further and show the errors "actually had an adverse effect on the defense. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." *Id.* *See Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir. 1999) (citing *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997)). Rather, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

A petitioner must satisfy both prongs of *Strickland* in order to prevail on an ineffective assistance of counsel claim. *See id.*, 466 U.S. at 687, 104 S. Ct. at 2064. It

is not necessary to address the performance and prejudice prongs in any particular order, nor must both prongs be addressed if the district court determines the petitioner has failed to meet one prong. *Id.*, 466 U.S. at 697, 104 S. Ct. at 2069. Indeed, the *Strickland* Court noted that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Tokar v. Bowersox*, 198 F.3d 1039, 1046 (8th Cir. 1999) (citing *Strickland*).

In short, a conviction or sentence will not be set aside "solely because the outcome would have been different but for counsel's error, rather, the focus is on whether 'counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" *Mansfield v. Dormire*, 202 F.3d 1018, 1022 (8th Cir. 2000) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993)).

## Analysis

### 1. Plea Colloquy and Factual Basis

Smith argues the trial court conducted a legally insufficient plea colloquy before accepting his *Alford* plea, and the court failed to establish that a factual basis existed to support his guilty plea. He argues the trial court shifted the burden of proof from one where the State had to prove his guilt to one where he had to prove his innocence, when the trial court asked, "Do you agree that any evidence which you or your witnesses would present before a jury would not necessarily overcome guilt beyond a reasonable doubt?" He claims the trial court erred in failing to do more than "make reference to the strong evidence in the minutes of testimony." Doc. No. 16 at 18; *see id.* at 16-22. He further argues his attorneys were ineffective in allowing him to enter guilty pleas "without any meaningful attempt of finding a factual basis[,]" resulting in prejudice to him. *Id.*, p. 21.

The State claims the issue preserved for review here was not whether Smith's attorneys were ineffective, but whether a factual basis existed for the court to accept Smith's plea. *See* Doc. No. 18, pp. 9-10. The State asserts Smith's habeas claim "can be liberally read to have intended to reple[a]d that preserved trial court error claim (which would require no ineffectiveness analysis), and thus the [State] proceeds upon that understanding in [its] briefing." *Id.*, p. 10. However, the court finds Smith did, in fact, preserve a claim of ineffective assistance of counsel for review when he alleged, in his *pro se* PCR application, that "Defendant's Counsel was ineffective in many different ways." Doc. No. 9 at 3(b), p. 4. In Smith's amended PCR application, which he filed with the assistance of counsel, he asserted both error by the trial court and ineffective assistance of counsel with regard to the plea proceedings. *See* Doc. No. 9 at 3(f). The Iowa Court of Appeals recognized that Smith had alleged his attorneys were ineffective, forming the basis for that court's remand of Smith's PCR case for an evidentiary hearing. *See* Doc. No. 9 at 4(e). In any event, in the present case, the court must examine the legality of the plea proceedings whether the claim is solely one related to errors by the trial court, or one related to ineffective assistance of counsel.

Smith entered a guilty plea without admitting he committed the criminal acts with which he was charged. The United States Supreme Court sanctioned this procedure in *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). In *Alford*, the Court held that "an express admission of guilt . . . is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id*, 400 U.S. at 37, 91 S. Ct. at 167. The Court found little difference between a plea of *nolo contendere* and a "plea containing a protestation of innocence when, as in

the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *Id.*

The Court noted several state and federal decisions "properly caution that pleas coupled with claims of innocence should not be accepted unless there is a factual basis for the plea, . . . and until the judge taking the plea has inquired into and sought to resolve the conflict between the waiver of trial and the claim of innocence." *Id.*, 400 U.S. at 38 n.10, 91 S. Ct. at 168 n.10 (citations omitted). The Court further observed that this safeguard is codified in Federal Rule of Criminal Procedure 11. *Id.* Rule 11 provides that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea," and the plea "is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)." Fed. R. Crim. P. 11(b)((2) & (3); *see* Ia. R. Crim. P. 2.8(2)(b). However, as the Eighth Circuit Court of Appeals explained in *Roberson v. United States,* 901 F.2d 1475 (8th Cir. 1990):

> On collateral attack, a formal violation of Rule 11 requires relief only if it creates a jurisdictional or constitutional error, resulting in a miscarriage of justice, violates the "rudimentary demands of fair procedure," or creates extraordinary circumstances. . . . Thus, unless [the defendant] can demonstrate that his plea was not knowing and voluntary, his collateral attack fails.

*Id.*, 901 F.2d at 1477 (citations omitted). The *Roberson* court also observed Rule 11 "does not require that the defendant admit the facts supporting the charge. A factual basis exists, even if the defendant protests his innocence, if sufficient evidence is presented at the time of the plea for the court to reasonably determine that the defendant committed the offense." *Id.* at n.3 (citations omitted). Thus, the issue here is whether "sufficient evidence" was presented at the time of Smith's plea for the court to make a reasonable determination that he had committed the offenses, and whether Smith's plea was knowing and voluntary. *See id.*

The State court ruled as follows on these issues:

> The Court shall not accept a plea of guilty without first determining that the plea is made voluntarily and intelligently and has a factual basis. Rule of Criminal Procedure 8(2)(b).

> Generally, the Court may determine a factual basis for a guilty plea by (1) inquiry of the defendant; (2) inquiry of the prosecutor; (3) examination of the pre-sentence report; or (4) reference to the minutes of testimony. However, in an Alford plea, because the accused is denying his guilt, a factual basis must be established independent of his statements. *State v. Hightower*, 587 N.W.2d 611 (Iowa App. 1998). Moreover, there is no requirement in an Alford plea that the defendant must acknowledge that the State's witnesses would testify as indicated by the prosecutor, nor agree with the facts as presented by the prosecutor or contained in either the pre-sentence investigation or minutes of testimony. *Id.* See also *State v. Hansen*, 221 N.W.2d 274 (Iowa 1974).

> The ultimate test for determining validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to an indicted accused. *State v. Hansen*, 221 N.W.2d 274 (Iowa 1974).

> An express admission of guilt is not a constitutional requisite to the imposition of criminal penalty. An accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime. *Id.*

> In the instant case, Judge Clarke relied upon the minutes of testimony for the factual basis for Defendant's pleas. Those minutes of testimony fully provide the factual basis for the pleas.

Doc. No. 9 at 3(k), Order, ¶ 3.

Although the State court cited only Iowa case law, the governing legal principles identified by the State court are consistent with those established by the Supreme Court in

*Alford*. The next inquiry is whether the State court applied those legal principles reasonably to the facts of this case, or, alternatively, whether the State court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Williams*, 529 U.S. at 407, 120 S. Ct. at 1520; 28 U.S.C. § 2254(d).

Here, the plea colloquy shows the trial court asked Smith questions designed to "resolve the conflict between the waiver of trial and the claim of innocence." *Alford*, 400 U.S. at 38 n.10. The judge confirmed through his questioning that although Smith continued to maintain his innocence, he believed it to be in his best interest to plead guilty. Although it may have been error for the trial judge to reformulate the burden of proof when he asked Smith if he agreed his evidence "would not necessarily overcome guilt beyond a reasonable doubt," any error was harmless in light of the fact that the court could accept Smith's guilty plea despite his unwillingness to admit he committed the acts constituting the crimes. *See Alford*, 400 U.S. at 37, 91 S. Ct. at 167. The judge expressly noted that "the minutes of testimony present[ed] strong evidence of guilt," a finding with which this court agrees. Smith elected to plead guilty to avoid the very real possibility that he would receive a life sentence if he was convicted on Count I, and a twenty-five year sentence on Count II. Much like the defendant in *Alford*, here Smith knowingly and intelligently concluded that he should plead guilty to the lesser charges rather than face the possibility of spending the rest of his life in prison.

The trial court did not err in accepting Smith's guilty pleas to the reduced charges. As a result, Smith's attorneys could not have been ineffective in recommending he accept the plea deal offered by the State, and in allowing his pleas to the reduced charges to be accepted by the trial court.

The State court's decision was consistent with clearly-established federal law, as determined by the Supreme Court, and was based on a reasonable determination of the

facts in light of the evidence. Smith's petition for writ of *habeas corpus* should be denied on this ground.

## 2. *Advice of Counsel*

Smith also argues his attorneys did not inform him properly of the fact that kidnapping in the third degree and sexual abuse in the second degree both were lesser-included offenses of the original charges. He argues, "The full understanding of lesser-included offenses was vital to the intelligent and knowledgeable taking of this plea." Doc. No. 16, pp. 23-24. He claims his attorneys should have discussed with him the fact that under Iowa law, a kidnapping conviction requires that "the confinement or movement of the victim must be more than just incidental to the commission of the aggravating crime." *Id.*, p. 24 (citing *State v. Ledezma*, 549 N.W.2d 307 (Iowa Ct. App. 1996)). He argues if he had been informed properly about lesser-included offenses and the "incidental rule," he would not have pled guilty and would have proceeded to trial.

Preliminarily, the State argues Smith did not raise any issue relating to lesser-included offenses in his petition in this case, and therefore, "no such claim is appropriately briefed now in this action." Doc. No. 18 at pp. 16-17. The court disagrees. Although Smith did not mention lesser-included offenses specifically in his *pro se* petition, he did claim his attorney failed to advise him of any defense other than a general denial. Doc. No. 3 at p. 5. In his amended petition, he claimed he "was not properly informed in regard to the plea he entered, [and] therefore it was not entered intelligently, knowingly and voluntarily." Doc. No. 16. Smith expressly raised issues relating to his attorneys' failure to inform him about lesser-included offenses in his PCR application, *see* Doc. No. 9 at 3(b), pp. 3-4, and the matter was explored during the hearing on Smith's PCR application. *See* Doc. No. 9 at 3(i), pp. 43-49. Although perhaps not pled in the most

artful manner, the court finds Smith has preserved the issue of whether his attorneys were ineffective in failing to advise him properly about lesser-included offenses.

The court finds Smith has failed to show either that his attorneys were ineffective in failing to discuss lesser-included offenses and the "incidental rule" with him, or that he was prejudiced. In his brief, Smith quotes from the testimony of the junior of his two trial attorneys, Mr. Rogers, who testified at the PCR trial that he was not familiar with the "incidental rule," and did not discuss it with Smith. *See* Doc. No. 16, p. 25. However, Smith ignores the testimony of his primary trial attorney, Mr. Thompson. Thompson testified that although he did not use the terms "incidental rule" or "confinement," he fully explained to Smith that the State would have to prove the victim was not free to leave; "she wasn't able to remove herself voluntarily." He indicated Smith appeared to be well-versed in the law, and he "certainly" had knowledge of lesser-included offenses. Thompson testified Smith understood what the State had to prove in order to convict him on each of the charges. *Id.*, pp. 43-52.

In addition, the trial judge summarized what the State would have to prove to convict Smith of each of the three counts, as amended. As to Count I, the charge of kidnapping in the third degree, the trial court stated:

> Count I as amended requires proof that on the dates in question you intentionally confined or removed the victim with the intent to inflict serious injury on the person or to subject the person to sexual abuse as at least the facts of this trial information or the minutes of testimony would support; that you knew that you did not have the victim's consent or authority to do so and that you did so with the specific intent of secretly confining the victim.

Doc. No. 9 at 1(*l*), p. 12. Smith stated he understood those elements, and he still wanted to plead guilty to the charge. *Id.*, pp. 12-14.

The State court found Smith's attorneys' performance "was within the normal range of competency," and Smith had failed to show "any deficiency in their performance" or

to "establish[] any breach by his trial counsel of an essential duty." Doc. No. 9 at 3(k) ¶ 6. The State court further found Smith could not show he was prejudiced. The court summarized "the minutes of testimony relied upon [by] the [trial] Court in accepting Smith's pleas," and found the minutes of testimony proved "Smith's confinement of his victim exceeded the confinement that would have been inherent to his assaults against the victim." *Id.* ¶ 5. Thus, the State court found Smith had failed to "show a reasonable probability that the result of the proceeding would have been different," had his attorneys advised him differently. *Id.*, ¶ 6.

Although the State court did not cite *Strickland* or other Supreme Court precedent, the legal principles applied by the court were identical to those set forth in *Strickland*. *See id.*, ¶ 4. Smith has failed to show the State court's decision was contrary to clearly-established federal law, involved an unreasonable application of that law, or resulted from an unreasonable determination of the facts in light of the evidence. His petition for writ of *habeas corpus* should be denied on this ground.

## Conclusion

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[5] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that Smith's petition for writ of *habeas corpus* be denied.

---

[5]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

The court finds further hearing on this matter would not be beneficial, and the hearing previously scheduled for May 7, 2008, at 10:00 a.m. is **cancelled**.

**IT IS SO ORDERED.**

**DATED** this 23rd day of April, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT